UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LUTRELL B. HUDDLESTON,

        Plaintiff,

  v.

CITY & COUNTY OF SAN FRANCISCO,
et al.,

        Defendants.

Case No. 16-cv-01998-JCS

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 53, 55

## I.    INTRODUCTION

Plaintiff Lutrell Huddleston, who is proceeding pro se, brings an employment discrimination case against her former employer, the Office of the Treasurer and Tax Collector ("TTX") of the City and County of San Francisco ("CCSF"), Tax Collector David P. Augustine, and her former supervisor, Assistant Tax Collector Attorney Debra D. Lew. Defendants bring a Motion for Summary Judgment ("Motion") seeking dismissal of all of Ms. Huddleston's claims. A hearing on the Motion was held on December 1, 2017 at 9:30 a.m. For the reasons stated below, the Motion is GRANTED.[1]

## II.    BACKGROUND

### A.    Factual Background[2]

Ms. Huddleston is an African-American woman who was, at the time of the relevant events, between 60 and 62 years old. First Amended Complaint ("FAC") at 4-7. She worked as an 8173 Legal Assistant in the TTX. Declaration of Jennifer Donnellan in Support of Defendants'

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).
[2] Except as otherwise stated, the facts set forth below are undisputed.

Motion for Summary Judgment ("Donnellan Motion Decl."), Ex. A (Huddleston

Deposition)("Huddleston Dep.") at 18. One of her main duties was working on Medical

Reimbursement Liens ("MRLs"). *Id.* According to Debra Lew, her supervisor during the relevant

period, in addition to reviewing MRLs, Ms. Huddleston's duties included drafting for attorney

review basic legal documents and pleadings, including liens and written discovery and performing

basic legal research. Declaration of Debra Lew ("Lew Decl.") ¶ 3. Lew reported to David

Augustine, who was the Tax Collector for most of the relevant period. *Id.* Although the Legal

Department had at least one other Legal Assistant, Ben Tsui, he was not responsible for MRLs

during the relevant time period. Huddleston Dep. at 113-114:3. Cathy McCarthy, a legal

secretary, also worked with Ms. Huddleston in the Legal Department. *Id.* at 35. Ms. Huddleston

was the only person in the Legal Department who reviewed MRLs, however. *Id.*. at 113.

TTX prepares MRLs in connection with its efforts to recover medical costs that the City

has incurred for treating injured patients at City hospitals, such as Zuckerberg San Francisco

General Hospital, by filing reimbursement liens in personal injury lawsuits. Lew Decl. ¶ 4.

During the relevant period, the procedure for preparing MRLs was as follows. First, a senior

collection officer ("SCO") from the Bureau of Delinquent Revenue would gather the pertinent

information, including the pending personal injury lawsuit complaint and detailed records of the

medical costs the City incurred. Huddleston Dep. at 18-21; Lew Decl. ¶ 4. Using a two-page

MRL template with proof of service, created by the Legal Division of TTX, the SCO would

change the template's caption to that of the personal injury case, add the amount of the requested

lien, insert the plaintiff's name in the body of the template, and include the plaintiff's counsel's

name and address in the proof of service. Huddleston Dep. at 20-21; Lew Decl. ¶ 4; Bound

Exhibits, Ex. A (MLR template). Next, the SCO would send the draft MRL and the backup

documentation to the Legal Department for approval. Lew Decl. ¶ 4.

Once the draft MRL was received by the Legal Department, it was Ms. Huddleston's

responsibility to ensure that she had received all of the required documents and to review the MRL

to confirm that the information contained in it was correct. Huddleston Dep. at 18-21; *see also id*.

at 243 (testimony that Huddleston "was responsible for catching mistakes." ). Ms. Huddleston

verified the following nine items on the MRLs: 1) the case number; 2) the county of the superior court; 3) whether the jurisdiction was limited or unlimited; 4) plaintiff's name in the caption; 5) defendant's name in the caption; 6) plaintiff's name in the body of the lien; 7) the date of first service rendered; 8) the amount of damages; and 9) the names and addresses of all attorneys on the proof of service. Lew Decl. ¶ 5; Huddleston Dep. at 27-28. Lew provided Ms. Huddleston with a checklist that listed these nine items and the back-up documentation that the SCO was supposed to have provided. Lew Decl. ¶ 11; Bound Exhibits, Ex. D (checklist). If Ms. Huddleston found an error, she would either correct it herself or send it back to the SCO for revision. Huddleston Dep. at 21. Then she would pass the MRL on to Lew for review and signature. *Id.* at 21-22. When Lew found errors in the MRLs, she returned them to Huddleston to correct. Lew Decl. ¶¶ 8-9. After Lew approved an MRL, she signed it and returned it to Ms. Huddleston, who would send it back to the SCO for filing and service. Lew Decl. ¶ 6.

Lew became Ms. Huddleston's supervisor in 2011. *Id.* ¶ 3. She was 55 years old at the time of Huddleston's retirement and is seven years younger than Ms. Huddleston. *Id.* ¶ 7; FAC at 4. On December 15, 2011, Lew sent Ms. Huddleston an email telling her that she had reviewed seven liens from Ms. Huddleston in the past two days and had rejected four of them due to errors. Bound Exhibits, Ex. A. Lew asked Ms. Huddleston to "[p]lease check and verify the information given to [her]," reminding her that "[y]ou cannot assume the [SCO's] work is accurate (and that is why we have to check it)." *Id.*

Lew states in her declaration that around April 18, 2012, she "found Ms. Huddleston standing at the copier ripping up paper for what [she] believed was an unnecessary amount of time." Lew Decl. ¶ 10. Lew further states that "this was not part of her duties, and [Lew] had given [Ms. Huddleston] pressing assignments in the form of two applications for order of examinations to draft." *Id.* At her deposition, Ms. Huddleston offered the following testimony regarding this incident:

> I was working on a document at the copier, and she kept on passing me while I was making copies. I'm trying to do an assignment she wanted me to do. It was a lot of copying that had to be done. And so, as I would do copies, I would have to get new reams of paper. The reams of paper are pretty wide, like when you take the paper apart there's a wide big sheet of paper. Because other people were

3

> using this copier it wasn't just me, there was like 4, 5 other people doing jobs. I was trying to get the copier done, hoping nothing would break down. I was standing up. I was tearing this huge thing you get when you take the ream off. I was tearing it up. She got on my case and told me I shouldn't be standing at the copier tearing up paper. That to me that's harassment.

Huddleston Dep. at 140-141.

According to Lew, Ms. Huddleston "continued to fail to spot errors in the MRLs." Lew Decl. ¶ 14. Lew states in her declaration that she returned MRLs to Huddleston due to errors on April 19, 2012 (one MRL returned because the year of the incident and amount of the lien were incorrect and the proof of service did not list both attorneys representing the plaintiff), April 26, 2012 (one MRL returned with an error in the plaintiff's name and caption and an error in an attorney's address in the proof of service), April 28, 2017 (the same MRL as on April 26, 2012 returned because the error in the plaintiff's name had not been corrected), May 1, 2012 (one MRL returned because it had the wrong county superior court listed on it), and September 24, 2012 (one MRL returned twice for the same error). *Id*. ¶¶ 10, 12-13, 15. Defendants have also attached copies of MRLs with notations indicating that Lew rejected them for errors on September 28, 2012, November 7, 2012, November 27, 2012, and November 28, 2012. Bound Exhibits, Exs. 17-20.[3]

Lew stated in her declaration that she "expected Ms. Huddleston to spot these errors in the MRLs and correct them." Lew Decl. ¶ 11. She further stated that "[t]he types of errors that Ms. Huddleston was making made it likely that a court would reject the MRL upon filing or the MRL would be deemed defective," which would "deny the City the ability to recover the monies to which it was entitled." *Id*. ¶ 18. Ms. Huddleston does not dispute that "[s]ometimes . . . [she] ma[d]e errors" but testified that these errors were "typos" and were not "really, really horrible." Huddleston Dep. at 96. Huddleston testified at her deposition that she told Lew, "If you find a typo, let me know, I will switch it off, no problem, get it out the door after it's signed." *Id*.

On July 23, 2012, Lew and Tax Collector, David Augustine gave Ms. Huddleston an

---

[3] TTX seeks to file these documents, which are marked-up MRLs, under seal on the basis that they are protected attorney work product. *See* Dkt. No. 53. As discussed below, the Court finds that Defendants have waived work product protection as to these documents.

"Overall Appraisal Rating" of "Did Not Meet Expectations" on her 2011-2012 Performance Plan and Appraisal Report ("2011-2012 Appraisal"). Lew Dec. ¶ 19; Declaration of David Augustine ("Augustine Decl.") ¶ 7; Bound Exhibits, Ex. E (2011-2012 Appraisal) at CCSF 000007. Lew and Augustine presented the performance appraisal to Ms. Huddleston and Ms. Huddleston signed the document. Augustine Decl., Ex. E.[4] The performance review notes that Ms. Huddleston had "errors in analyzing" and summarizing "pertinent factual and financial information" and "errors in modifying judicial council forms, letters, and pleadings . . . ." *Id.* at CCSF 000004. With respect to MRLs specifically, the Appraisal Report comments that "[h]ospital liens are often not accurate; have been submitted in improper form; does not employ mechanisms to verify accuracy." *Id.* In comments regarding Overall Performance, the Appraisal Report states that Ms. Huddleston is "a very likeable person" but that "her work product is often incomplete and inaccurate, particularly concerning [MRLs] where her primary duty is to proofread for accuracy. Lutrell neglects to follow procedures which would enable her to verify the accuracy of the liens." *Id.* at CCSF 000007.

On the same day, TTX placed Ms. Huddleston on a Performance Improvement Plan ("July 23, 2012 PIP"). Augustine Decl. ¶ 8; Lew Decl. ¶ 20. The July 23, 2012 PIP was divided into three periods; after the close of each period, Ms. Huddleston and Lew were to meet to discuss whether Ms. Huddleston's performance met TTX standards and if it did not, why not. *Id.* Lew met with Ms. Huddleston after the first and second periods, but she did not meet with Ms. Huddleston promptly at the close of the third period and therefore Augustine decided to set aside the July 23, 2012 PIP. Lew Decl. ¶ 21; Augustine Decl. ¶ 9.

TTX established a new PIP for Ms. Huddleston on October 26, 2012 ("October 26, 2012 PIP"), which Ms. Huddleston signed. Lew Decl. ¶ 22; Augustine Decl. ¶ 10; Bound Exhibits, Ex. F (October 26, 2012 PIP). That PIP covered the period from October 29, 2012 to January 25, 2013; however, Ms. Huddleston was on leave for part of that time so TTX extended the PIP

---

[4] The signature carries a notation "As Amended." *Id.* at 000009. It appears that the amendments changed the wording of the two comments quoted below and added a comment recognizing improvement in the accuracy of Huddleston's medical reimbursement liens in the month of June 2012.

completion deadline to February 15, 2013. *Id.* As with the earlier PIP, the October 26, 2012 PIP

had three compliance periods. The PIP also listed three "performance improvement areas," each

with a corresponding goal. The goals were as follows:

> 1. GOAL: To review entire file for pertinent facts or financial information as needed, organize the particular information, then prepare written summary in memo form to substantiate the conclusion
>
> . . .
>
> 2. GOAL: To identify what general facts and law are relevant to the assignment; to organize the facts in an understandable chronological manner . . . ; not to use hearsay or make unsubstantiated assertions in declarations and statements of facts; and use proper grammar to the extent possible.
>
> The legal forms and other adaptable information should be chosen and filled out accurately and completely at least 80% of the time by the end of period 1; 85% by the end of period 2 and 90% by period 3 with little or no assistance.
>
> 3. GOAL: To proofread and provide the reviewing attorney accurate, complete, and legally compliant Medical Reimbursement Liens and proofs of service with the supporting documents to enable efficient verification. The Medical Reimbursement Liens and proofs of service with supporting documents must be at least . . . 6 liens per week with 85 % by the end of period 2 with little or no assistance.

Bound Exhibits, Ex. F (October 26, 2012 PIP) at CCSF 000619. The October 26, 2012 PIP

reflects that Ms. Huddleston met the first goal for the second period but did not meet it for the first

or third period. *Id.* at CCSF 000618. The second goal was not applicable for the first period and

Ms. Huddleston failed to meet it for the second and third periods. *Id.* at CCSF 000619. With

respect to the third goal, related to Ms. Huddleston's MLR accuracy, the October 26, 2012 PIP

reflects that Ms. Huddleston met that goal for the first period, with an accuracy rate of 82.15%

(23/28 correct) but that she did not meet the goal for the second and third periods. *Id.* at CCSF

000620. In particular, her accuracy rate for the second period was 57.14 % (4/7 correct) and for

the third period was 77% (7/9 correct), thus falling below the target of 85% accuracy for those

periods. *Id.* Lew met with Ms. Huddleston to provide feedback at the end of each period, on

December 4, 2012, February 6, 2013 and February 21, 2013. Lew Decl. ¶ 22.

On March 11, 2013, TTX issued a Written Warning for Huddleston's failure to perform

1    the essential functions of her job, signed by Debra Lew and David Augustine.  Augustine Decl. ¶

2    11; Bound Exhibits, Ex.G (Written Warning).  The Written Warning, which was mailed to Ms.

3    Huddleston's home by certified mail, stated that Ms. Huddleston "did not meet the goal set on the

4    [October 26, 2012] PIP" because, among other things, she "failed to achieve the required degree of

5    accuracy for medical reimbursement liens."  *Id*. at CCSF 000117.  It stated that the rate of Ms.

6    Huddleston's errors "merits this Written Warning," which was to be placed in her personnel file.

7    *Id*.  It went on to warn that "[i]f your performance does not improve, you may get additional

8    discipline, up to and including termination."  *Id.*

9         Ms. Huddleston took a leave of absence from April to November 2013. Huddleston Dep. at

10   133.  Ms. Huddleston states that she took the leave of absence because Defendants "caused [her]

11   to have a nervous breakdown." September 8, 2017 Huddleston Declaration ("First Huddleston

12   Decl.") ¶ 17; Huddleston Dep. at 123.  She has also submitted an excerpt of a report by Qualified

13   Medical Evaluator Dr. George Becker, dated September 10, 2013, in which he found that

14   "personnel actions were . . . the sole cause of the psychiatric injury" suffered by Huddleston.

15   October 5, 2017 Huddleston Declaration ("Second Huddleston Decl."), Ex. 2 (Becker Letter,

16   Excerpt).[5]

17        When Ms. Huddleston returned to work, she was again placed under Lew's supervision.

18   While Ms. Huddleston was on leave, Stephanie Profitt joined TTX as Tax Collector Attorney.

19   Declaration of Stephanie Profitt ("Profitt Decl.") ¶ 5.  Profitt supervised Lew.  *Id.* ¶ 3.  According

20   to Ms. Huddleston, eight days after she returned from her leave of absence, Profitt told her that

21   Augustine had instructed her to place Ms. Huddleston on another PIP.  Huddleston Dep. at 130.

22   On January 16, 2014, Ms. Huddleston was placed on another PIP ("January 16, 2014 PIP"), which

23   was scheduled to run from January 16, 2014 to March 21, 2014.  Profitt Decl. ¶ 6; Lew Decl. ¶ 25;

24   Bound Exhibits, Ex. H (January 16, 2014 PIP).  Profitt presented Ms. Huddleston with the PIP.

25   Profitt Decl. ¶ 6.  According to Augustine, this PIP was based on Ms. Huddleston's poor

26   performance before her leave of absence. Augustine Decl. ¶ 13.  Huddleston testified that she

27

28   [5] Because the excerpt did not include Dr. Becker's summary of the relevant facts, it is impossible
     to determine what "personnel actions" Dr. Becker was referring to.

thought that after she returned from her breakdown "they would be nice, just let [her] work in peace" and that she asked Profitt to talk to Augustine and "tell [Augustine] to leave [her] alone" and to ask him to stop giving her PIPs. *Id*. at 227-229. Profitt told Huddleston that Augustine would not agree to discontinue the PIP. *Id*. at 229.

The January 16, 2014 PIP, like the previous PIPs, was broken down into three periods. Profitt Decl. ¶ 6; Lew Decl. ¶ 25, Bound Exhibits, Ex. H. The January 16, 2014 PIP also listed three goals. Bound Exhibits, Ex. H. The goals were as follows:

> 1. GOAL: To proofread and provide the reviewing attorney accurate, complete, and legally compliant Medical Reimbursement Liens and proofs of service with the supporting documents to enable efficient verification. The Medical Reimbursement Liens and proofs of service with supporting documents must be at least 8 liens per week with an accuracy rate of 90% with little or no assistance.

> 2. GOAL: To identify what general facts and law are relevant to the assignment; to organize the facts in an understandable chronological manner . . . ; to properly format a legal document (define the party before using short name; identification and use of attached Exhibits); not to use hearsay or make unsubstantiated assertions in declarations and statements of fact; and use of proper grammar to the extent possible.

> The legal forms and other adaptable information should be chosen and filled out accurately and completely at least 90% with little or no assistance.

> 3. GOAL: To review entire file for pertinent facts or financial information as needed, organize the particular information, then prepare written summary in memo form to substantiate the conclusion.

*Id.*

Ms. Huddleston failed the first two goals for all three of the periods. *Id*. She met the third goal for the first and third periods; that goal was not applicable for the second period. *Id*. Profitt and Lew met with Ms. Huddleston at the end of each period, on February 7, March 31, and April 24, 2014, to review her performance. Profitt Decl. ¶ 6; Lew Decl. ¶ 25. Ms. Huddleston testified that although Profitt had told her she would participate in the meetings as a neutral party, she scrutinized Ms. Huddleston's work as much as Lew did. Huddleston Dep. at 161-162. Ms. Huddleston also testified that she had completed special assignments for Profitt and that Profitt had told her that her work was "perfect" but that Profitt refused to add this to the PIP even though

she knew Ms. Hudldleston would pass the PIP if this information were included. *Id.* at 165-167. Ms. Huddleston believed that Profitt was going along with a plan of Augustine and Lew for Ms. Huddleston to fail the PIPs. *Id.*

On May 12, 2014, TTX sent to Ms. Huddleston's home address a Notice of Proposed Discipline seeking to impose a one-day suspension for "inattention to duty and inability to perform the essential functions of the 8173 Legal Assistant position." Augustine Decl. ¶ 14.[6] According to Ms. Huddleston, this warning should not have been sent to her home. Declaration of Lutrell B. Huddleston in Support of Plaintiff's Supplemental Brief in Opposition to Motion for Summary Judgment ("Huddleston Supp. Decl.") ¶ 8. Instead, she contends, [Augustine] "should have talked to [her] at the office [ ] first." *Id.* Ms. Huddleston further states that "[p]aragraph 1 as well as paragraph 3 are just not factual" and that the warning was "laughable and ludicrous" because she "never had work performance issues grievous enough to get a written warning for inattention to duty and inability to perform the essential functions of the 8173 Legal Assistant position." *Id.*

Pursuant to due process requirements, TTX scheduled and held a *Skelly* hearing on May 28, 2014.[7] Augustine Decl. ¶ 15. Ms. Huddleston and her union representative attended the meeting and requested additional documentation. *Id.* TTX agreed to provide the requested documentation. *Id.* TTX gathered the requested documents and attached them as an exhibit to the Amended Notice of Proposed Discipline and *Skelly* Meeting ("Amended Notice"), which it sent to Ms. Huddleston on September 4, 2014. Augustine Dec. ¶ 15; Bound Exhibits, Ex. I. TTX rescheduled the *Skelly* meeting for September 19, 2014. *Id.*

In the meantime, TTX placed Ms. Huddleston on another PIP beginning August 4, 2014. ("August 4, 2014 PIP"). Profitt Decl. ¶ 7; Lew Decl. ¶ 26; Bound Exhibits, Ex. J (August 4, 2014 PIP.) The goals were as follows:

---

[6] The May 12, 2014 notice was not provided by the parties but is referenced in an amended notice (discussed below) that was attached to the Bound Exhibits. *See* Bound Exhibits, Ex. I.
[7] A *Skelly* hearing refers to the due process meeting required under *Skelly v. State Personnel Bd.*, 15 Cal. 3d 194 (1975), when a public employee faces a potential deprivation of his or her property interest as an employee.

9

1. GOAL: With an accuracy rate of 90% per PIP period, proofread and provide the reviewing attorney with accurate, complete, and legally compliant Medical Reimbursement Liens and proofs of service.

2. GOAL: Identify what facts and law are relevant to the assignment; organize the facts in an understandable chronological manner, if necessary . . . ; understand which is the proper legal form to use and why; properly format documents; and use proper grammar and punctuation.

The legal forms, pleadings, and/or correspondence should be correct and completed with a 90% accuracy rate over each PIP period with minimal assistance.

3. GOAL: Accurately create [ancillary records to support collection efforts] within a reasonable time period with limited assistance.

Bound Exhibits, Ex. J. Lew and Profitt met with Ms. Huddleston after the first and second compliance periods. Lew Decl. ¶ 26. For the first period (August 4-21, 2014), Ms. Huddleston met the goal of proofreading MRLs with a 90% accuracy rate. Bound Exhibits, Ex. J (August 4, 2014 PIP) at CCSF 000268. She failed that goal in the second period, however. *Id.* For both periods, she failed to meet the third goal.

Ms. Huddleston did not complete the third period of the PIP, which was to run from September 12, 2014 to September 25, 2014, because on September 13, 2014, she retired. Huddleston Dep. at 123. According to Lew, Ms. Huddleston gave notice of her retirement by slipping a note under her door, along with her access card, apparently after Lew had left for the evening. Lew Decl. ¶ 27. Although Ms. Huddleston did not give Lew advance notice of her plan to retire, Ms. Huddleston testified that she had decided to retire three months earlier, after receiving confirmation from the retirement board that she could receive retirement benefits. Huddleston Dep. at 286-287; 288-291.

Ms. Huddleston testified at her deposition that although she did not experience "overt raciscm," she was subjected to "subtle rascism." *Id.* at 30. She also testified that she never heard anyone say anything negative to her about her age or her sex, but believed that she was treated less favorably than others because of both. *Id.* at 69, 237. As an example of such unfavorable treatment, she recounted being called into Augustine's office two days in a row and being questioned about shirts she was wearing – on the first day a "creative" shirt that had a large picture

of Tina Turner on it and on the next day a shirt made from ethnic cloth from Africa called a "Dashiki." *Id*. at 54-55. As to the first shirt, Augustine told Ms. Huddleston that it violated the dress code because it had a person's face on it. *Id*. at 55. He also "called it a T-shirt," though Huddleston testified that it was made of "expensive . . . material." *Id*. at 54. Huddleston also testified that Augustine gave her a copy of a written dress code when he called her into his office that day. *Id*. at 55. The next day, Augustine asked Ms. Huddleston why her shirt was different from the previous day and Huddleston explained "what a Dashiki" is. *Id*. at 57. Augustine apparently did not tell Huddleston that the Dashiki violated the dress code and instead thanked Ms. Huddleston for explaining what it was. *Id*. at 58. Ms. Huddleston testified that no further action was taken with respect to either shirt and they were not mentioned again by any supervisor. *Id*.

Another example of discrimination offered by Ms. Huddleston at her deposition concerned a fan. According to Ms. Huddleston, at a TTX Christmas party, she had brought out a fan and was fanning herself with it. *Id*. at 83-84. She was showing it to Augustine because it was "really, really cute" and told Augustine that it was "good for hot flashes." *Id*. A few months later, Huddleston brought out the fan on a warm day and Augustine said, "Oh, that's the fan that is good for hot flashes." *Id*. at 84.

Ms. Huddleston also testified that on one occasion in 2012, Lew asked her two use five different colored pens when she was correcting interrogatories. *Id*. at 142, 151. Huddleston told Lew that she "was not going to do that" because it didn't "make any kind of sense." *Id*. at 151. Huddleston believed Lew asked her to use the colored pens based on her race, sex and age and that the request was "harassing." *Id*. at 142, 151.

According to Ms. Huddleston, another example of discrimination occurred after she returned from her leave of absence, when the mail section of the legal department was looking for volunteers to work overtime to take care of a backlog. *Id*. at 73. Ms. Huddleston expressed interest in the assignment to Profitt but Profitt subsequently told her that Augustine had denied the request. *Id*. Ms. Huddleston testified that she believed Augustine denied her request "because he is a racist" and had "sexual orientation issues." *Id*. at 73-74. Ms. Huddleston testified that she did

not know who else volunteered for this assignment or was approved for the overtime. *Id.*

Ms. Huddleston testified that after she returned from her leave of absence, legal secretary Cathy McCarthy told her that she had been instructed "not to talk" to Ms. Huddleston. *Id.* at 42. McCarthy did not tell her who had given her these instructions. *Id.*

Other conduct that Ms. Huddleston believes was discriminatory and harassing was: 1) an incident when Augustine brought a group of people into the office and was introducing them to TTX staff but passed over Ms. Huddleston, *id.* at 50; 2) Lew's requirement that Ms. Huddleston respond immediately to messages from Lew when they popped up on her computer, *id.* at 121-122, 154-155; 3) Augustine's denial of a request by Ms. Huddleston for overtime to finish some MLRs, *id.* at 79; and 4) a request that Ms. Huddleston's desk be moved closer to Lew's, *id.* at 72.

Ms. Huddleston contends Augustine was determined to get rid of her and that he led a campaign to do so, with Lew and Profitt following his instructions. *See, e.g., id.* at 165, 286. She also testified that Profitt told her as much shortly before she retired. *Id.* ar 118. In particular, Ms. Huddleston testified that she asked Profitt who "put [her] up to this" and Profitt "said David [Augustine], she said Debra [Lew] helped, and the panel." *Id.* at 117-118. In a declaration, she states that she believed he wanted to "run [her] off" "so that he could take the City's part of [her] pension away from her." Huddleston Supp. Decl. ¶ 7.

## B. The Complaint

In the First Amended Complaint, which is the operative complaint, Ms. Huddleston asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e – 2000e-17 and the Age Discrimination in Employment Act of 1976, 29 U.S.C. §§ 621-634.

First, she asserts a claim for "Discrimination/Disparate Treatment" based on race and sex (Claim One). In that claim, Ms. Huddleston alleges that she was treated differently from "colleagues who were not Black," citing her failing scores on her PIPs, her 2011-2012 Appraisal, and the written warning and amended warning that were sent to her house, and asserting that neither Ben Tsui nor Cathy McCarthy, who are not Black, received any of this "unwanted and unlawful treatment." FAC at 3-4. Ms. Huddleston alleges further that she was the sole Black employee in the Legal Section of TTX. *Id.* She alleges that she was forced into retirement and

that her position was filled by a younger white male. *Id.* at 4.

Second, Ms. Huddleston asserts a claim for Age Discrimination (Claim Two), alleging that she was subjected to adverse treatment such as teasing about hot flashes and criticism about her clothes based on her age. *Id.* She further alleges that she was the oldest member of the Legal Department at the time of her retirement and that her position was filled by a younger white male. *Id.*

Third, Ms. Huddleston asserts a claim for Hostile Work Environment Created by Plaintiff's Supervisor (Claim Three). *Id.* at 5. This claim is based on alleged harassment of Ms. Huddleston by Debra Lew based on Huddleston's race, sex and age. *Id.* According to Ms. Huddleston, Lew's harassing conduct was directed by David Augustine and included "ma[king] sure that [Ms. Huddleston] received low marks on [her] Performance Appraisal and [PIPs] so that [she] could eventually be terminated." *Id.* In support of this claim Ms. Huddleston further alleges that she was denied the accommodation recommended by the City's Independent Medical Examiner when she returned to work after her leave of absence, namely, that she was not to have any contact with Lew or Augustine. *Id.* at 6.

Fourth, Ms. Huddleston asserts a claim for Hostile Work Environment Created by Plaintiff's Co-Worker (Claim Four) based on the conduct of Stephanie Profitt, who allegedly "wound up, with the blessing of Debra D. Lew and David P. Augustine scrutinizing me on a more 'negative' and 'discriminatory' sophisticated level." *Id.* at 7.

### C. The Motion

In the Motion, Defendants challenge Ms. Huddleston's discrimination claims (Claims One and Two) on the grounds that she fails to make a prima facie case of discrimination and that she cannot show that the City's legitimate, non-discriminatory reasons for its conduct are pretext. As to the harassment claims, Defendants contend they are entitled to summary judgment because the conduct alleged by Huddleston is not so severe and pervasive as to alter the terms and conditions of her employment.

In her supplemental opposition brief, Ms. Huddleston contends there are material factual disputes and that her claims should be decided by a jury. Dkt. No. 69 (Supplemental Brief in

13

Opposition to Motion for Summary Judgment) at 3-4.  In support of her brief she has filed her own

declaration, a declaration by coworker Jo Anne Adams, an excerpt of QME Dr. Becker's report,

and an email exchange between Ms. Huddleston and Profitt in which Ms. Huddleston asked not to

be placed on a PIP in January 2014 and Profitt denied her request.

Defendants assert evidentiary objections to Ms. Huddleston's supplemental declaration.

They also ask the Court not to consider the Adams declaration on the basis that Ms. Huddleston

did not list Adams in her initial disclosures, as required under Rule 26(a)(1) of the Federal Rules

of Civil Procedure.  Reply at 6.  Defendants assert the Court should exclude this declaration

pursuant to Rule37(c)(1) of the Federal Rules of Civil Procedure.  *Id*.  Defendants also assert a

variety of specific objections to statements in the Adams declaration, including objections that

numerous statements are not based on personal knowledge and/or constitute hearsay.  *Id*. at 7-9.

## III.    ANALYSIS

### A.    Motion to File Under Seal

Defendants have filed a Motion to File Documents Under Seal asking the Court to seal

Exhibits 1-20 (draft legal pleadings) and Exhibits F, G, H, and I (performance improvement plans,

a written warning and an amended notice of intent to suspend for one day), on the basis that they

contain attorney work product and that the protection to which such materials are entitled has not

been waived.  Dkt. No. 53.  Defendants note that as to Exhibits F, G, H, and I, these documents

were provided to Ms. Huddleston in partially redacted form (omitting the names of the debtors) in

order to give her notice of her performance deficiencies, but that Defendants did not intend to

waive work product protection when they provided them to her.  Dkt. No. 53-1 (Lew Decl.) ¶ 7.

The documents that Defendants seek to protect as work product were produced to Ms.

Huddleston in this litigation, albeit under a protective order, and are being used by Defendants to

defend against her claims.  Because, Ms. Huddleston is an adversary, Defendants have waived any

protection to which the documents may have been entitled (with the exception of the portions of

those documents that were redacted when they were produced to Ms. Huddleston).  As the Third

Circuit explained in *Westinghouse Elec. Corp. v. Republic of Philippines*, "the work-product

doctrine promotes the adversary system directly by protecting the confidentiality of papers

prepared by or on behalf of attorneys in anticipation of litigation." 951 F.2d 1414, 1428 (3d Cir. 1991). While disclosure of work product to a third party does not necessarily waive the protection, it *does* result in a waiver if the disclosure "enable[s] an adversary to gain access to the information." In *Westinghouse*, the court found that this principle applies even where the disclosure is to a *different* adversary than the opponent in the underlying litigation to which the work product relates, and that it applies even when the party disclosing the materials reasonably expected that they would remain confidential. *Id*. at 1429-1430; *see also In re Worlds of Wonder Sec. Litig*., 147 F.R.D. 208, 212 (N.D. Cal. 1992) (adopting rule from *Westinghouse* that disclosure of work product to an adversary results in waiver and that parties "may not pick and choose to which adversaries they will reveal documents").

Having produced documents that contain work product in this litigation to Huddleston, who is clearly an adversary, Defendants have waived work product protection as to the materials they seek to file under seal. Therefore, the Motion to Seal is DENIED.

### B. Objections to Adams Declaration

Defendants assert that the Court should decline to consider the Adams Declaration pursuant to Rule 37(c) of the Federal Rules of Civil Procedure because Ms. Huddleston did not list Ms. Adams in her initial disclosures. The Court DENIES that request because Defendants failed to comply with Civil Local Rules 37-4(a) and 7-8. These rules govern requests for sanctions under Rule 37 of the Federal Rules of Civil Procedure and require that such requests "must be separately filed." On the other hand, the specific objections Defendants assert as to the Adams Declaration are well-taken. The Court sustains those objections on the grounds stated in Defendants' brief. *See* Reply at 6-9.[8]

### C. Legal Standard Under Rule 56

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[8] Defendants also assert various evidentiary objections to Ms. Huddleston's supplemental declaration. *See* Reply at 5-6. The Court does not rule on these because even assuming the statements made in Ms. Huddleston's declaration are admissible, they do not change the Court's conclusion that Defendants are entitled to summary judgment on all of her claims.

law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*. Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### D. Discrimination Claims

#### 1. Legal Standard

To survive summary judgment on her discrimination claims under Title VII and the ADEA, Ms. Huddleston must point to direct evidence of discriminatory intent or raise an inference of discriminatory intent under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*"). *Metoyer v. Chassman*, 504 F.3d 919, 930–31 (9th Cir. 2007) (to prevail on discrimination claim asserted under Title VII, 42 U.S.C. § 2000e, plaintiff must point to direct evidence of discriminatory intent or raise an inference of discriminatory intent under *McDonnell Douglas*); *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (*McDonnell Douglas* framework applies to Title VII claims); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (assuming *McDonnell Douglas* framework applies to ADEA claims where the parties do not dispute that it may be applied); *Wool v. Weil, Gotshal & Manges, LLP*, No. C 07-00646 WHA, 2008 WL 793788, at *9 (N.D. Cal. Mar. 24, 2008) (applying *McDonnell Douglas* framework in age discrimination case under ADEA to decide summary judgment motion where parties did not dispute that it could be applied).

"[D]irect evidence is evidence which, if believed, proves the fact [of discriminatory

animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (citation omitted). The Ninth Circuit has held a "stray remark" that is "uttered in an ambivalent manner and [is] not tied directly to" the adverse employment action is insufficient to create an inference of discriminatory animus. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir.1990); *see also Scott v. Sears, Roebuck & Co.*, 395 F. Supp. 2d 961, 973 (D. Or. 2005)("Not every comment about a worker's age is direct evidence of a discriminatory motive").

Under the *McDonnell Douglas* framework, the plaintiff first must establish a prima facie case of discrimination. *Hawn*, 615 F.3d at 1155. To make a prima facie case of discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that persons outside his protected class with equal or lesser qualifications, were given more favorable treatment. *Hodge v. Oakland Unified Sch. Dist.*, No. C 09-04719 RS, 2012 WL 1933678, at *4 (N.D. Cal. May 29, 2012), aff'd, 555 F. App'x 726 (9th Cir. 2014). "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994) (citation omitted).

If the plaintiff establishes a prima facie case, the burden of production, but not persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions. *Hawn*, 615 F.3d at 1155. If this burden is met, the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons for [the challenged conduct] are mere pretext for unlawful discrimination." *Id.* "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citation omitted). The employee must offer "'specific, substantial evidence of pretext.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir.1994) (quoting *Steckl v. Motorola*, 703 F.2d 392, 393 (9th Cir. 1983)). Evidence as to pretext is considered cumulatively. *Chuang v. University of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000).

United States District Court
Northern District of California

### 2. Whether There is Direct Evidence of Discriminatory Intent

Ms. Huddleston has conceded that none of the individuals who supervised her (and indeed, no one at TTX) ever made overt statements reflecting discriminatory animus based on her race, sex or age. The only evidence in the record that might conceivably constitute direct evidence of discriminatory intent is Ms. Huddleston's testimony regarding the comment by Augustine about her fan and his reaction to two of Ms. Huddleston's shirts (the "artistic shirt" with an image of Tina Turner on it and the Dashiki). The Court concludes that neither is sufficient to demonstrate discriminatory intent.

Augustine's comment about Ms. Huddleston's fan ("Oh, that's the fan that is good for hot flashes") is ambiguous and has no apparent connection to any adverse employment action. Based on Ms. Huddleston's own account, Augustine merely repeated back to her a remark that she had made to him on a past occasion about the same fan. In that context, this statement does not prove the fact of discriminatory animus without inference or presumption even if it is an acknowledgement of Ms. Huddleston's age and sex. It is, at most, a "stray comment" that is not sufficient to defeat summary judgment.

Similarly, Ms. Huddleston's testimony about Augustine's reaction to two shirts she wore to the office is not sufficient to establish discriminatory intent. With respect to the first shirt, Augustine's criticism was based on the fact that it had a face on it – something that he said violated the dress code. He did not aim his criticism at the *particular* face on the shirt or make any comment about the race, age or sex of the person depicted on the shirt; nor does Ms. Huddleston argue or offer any evidence that the dress code (a copy of which Augustine provided to Ms. Huddleston at the time of the incident) did not, in fact, prohibit shirts with faces on them. As to the Dashiki, there is no evidence in the record that Augustine called Ms. Huddleston in to his office because the shirt had (according to Ms. Huddleston) an African motif. To the contrary, Ms. Huddleston testified that Augustine did not criticize her for wearing it but instead thanked her once she explained to him what a Dashiki was. Again, assuming Ms. Huddleston's testimony to be true, Augustine's statements and conduct about Ms. Huddleston's shirts do not prove the fact of discriminatory animus without further inference.

### 3. Evidence of Discriminatory Intent Under *McDonnell Douglas*

#### a. *Prima Facie* Case

Defendants contend Ms. Huddleston fails to make a prima facie case of discrimination because: 1) she cannot demonstrate that she was performing the duties of her position competently; 2) she did not suffer an adverse action; and 3) she has not shown that similarly situated employees were treated differently or that any adverse action occurred under circumstances suggesting discrimination. Motion at 12-14. The Court concludes that Ms. Huddleston has not made a *prima facie* case of discrimination because even drawing all reasonable inferences in her favor, Ms. Huddleston has not demonstrated that she was performing the duties of her position competently.

"'A plaintiff who violates company policy and fails to improve his performance despite a warning has not demonstrated satisfactory performance.'" *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1208 (9th Cir. 2008) (quoting *Mungro v. Giant Food, Inc.*, 187 F.Supp.2d 518, 522 (D.Md. 2002)). Thus, in *Diaz*, the court of appeals found that the district court had properly granted summary judgment in favor of the employer in an age discrimination case as to one of the plaintiffs who had "over an extended period openly violated [the employer's] policy against solicitation on company property and continued to do so even after receiving a warning from [the employer]." 521 F.3d at 1208. The court reasoned that no reasonable juror could have found that this employee's performance was satisfactory and therefore, that he had not made a prima facie case of discrimination. *Id*.

Here, Ms. Huddleston does not dispute that one of her main duties was working on the MLRs. Huddleston Dep. at 18. She also does not dispute that she did not always correct errors in the MLRs with respect to the particular fields on her checklist, even though it was her responsibility to do so. *Id*. at 96. Nor does she challenge the accuracy rates reflected on her PIPs as to the MLRs, which fell below the goals established under the PIPs with respect to accuracy for almost every performance period. *See* Bound Exs. F, H & J. Ms. Huddleston also does not point to any evidence from which a juror could reasonably conclude that she performed adequately as to the other goals on the PIPs, the vast majority of which she did not meet. *Id*. Indeed, there is no

1    evidence in the record that contradicts the conclusions in the PIPs with respect to her performance.

2    For this reason, Ms. Huddleston has not made a *prima facie* case of discrimination.

3              b.    *Pretext*

4              Even assuming that Ms. Huddleston has made a *prima facie* case of discrimination,

5    Defendants are entitled to summary judgment on her discrimination claims because she has not

6    offered "specific, substantial evidence" that the non-discriminatory reason offered by Defendants

7    for the conduct at issue – that Ms. Huddleston was not performing the requirements of her job

8    adequately – was pretext.

9              Defendants have presented evidence that they repeatedly counseled Ms. Huddleston that

10   her performance was deficient, placed her on a series of PIPs that she failed, sent her a warning

11   letter, and eventually threatened to suspend her on the basis that her performance was deficient.

12   "'The [anti-discrimination law] was not intended as a vehicle for the general judicial review of

13   business decisions.'" *Nasser v. AT & T Corp.*, No. C 05-5426 PJH, 2007 WL 1119203, at *8

14   (N.D. Cal. Apr. 16, 2007), aff'd, 307 F. App'x 103 (9th Cir. 2009) (quoting *Phipps v. Gary

15   Drilling Co.* 722 F.Supp. 615, 620 (E.D. Cal. 1989)).  Nor is *McDonnell-Douglas* "a device which

16   permits the jury to examine an employer's reasons for discharge and determine that the employer's

17   business judgment or policies do not appeal to its sensibilities."  *Phipps*, 722 F. Supp. at 621

18   (quoting *Elliott v. Group Medical and Surgical Service*, 714 F.2d 556 (5th Cir.1983)).  The

19   relevant inquiry for the Court is whether Ms. Huddleston has shown with specific, substantial

20   evidence that the reason offered by Defendants for their conduct is pretext and that in fact, she was

21   discriminated against on the basis of her race, sex or age.  The Court concludes that she has not.

22             Ms. Huddleston testified in her deposition that the conduct at issue was, in large part, at the

23   direction of Augustine, who she contends was a "racist" and had "sexual orientation issues." *Id.* at

24   73-74.  Apart from her own opinion that Defendants' treatment of her was because of her age, race

25   and sex, however, the only admissible evidence she cited was that she was the only African-

26   American employee in her division and that she was older than the other employees (including her

27   supervisors).  She did not, however, offer any *specific* evidence that other similarly situated

28

                                                   20

employees who were not in these protected groups were treated more favorably.[9]  In particular, she conceded that she was the only individual in the TTX who worked on MLRs and she offered no specific evidence that her co-workers were treated more favorably with respect to any shortcomings in their performance of comparable assignments.   Although Ms. Huddleston testified that she believed she was scrutinized more closely than her co-workers, she was unable to point to specific and substantial evidence suggesting that this was the case.  Moreover, to the extent that Ms. Huddleston relies on the fact that she was replaced by a younger, white male after she retired, this is not sufficient to demonstrate pretext.  *Phipps*, 722 F. Supp. at 622 ("Replacement by a younger employee alone, however, does not prove age discrimination or even create a strong presumption of discrimination . . .").

In sum, the Court concludes that Ms. Huddleston has failed to meet her burden on summary judgment of demonstrating discriminatory animus.  Accordingly, Defendants are entitled to summary judgment as to the discrimination claims.

### E.    Harassment Claims

#### 1. Legal Standard

To establish a *prima facie* case for a claim for harassment based on hostile-work

---

[9] Huddleston relies on the Adams Declaration to show that she was treated less favorably than other employees with respect to PIPs.  Adams works at TTX, apparently as an SCO.  Adams Decl. ¶ 2 & Ex. 1 (MLR checklist reflecting that "Collections Officer" was Jo Anne Adams).  Adams, who is a white female, states that she was once placed on a PIP because she inadvertently made an error.  Adams Decl. ¶ 3.  Adams's PIP was discontinued, whereas Huddleston's was not, leading Adams to conclude that the continuation of Huddleston's PIP was a result of the fact Huddleston was black.  *Id*. ¶ 4. Adams further states that she knows of another woman who was placed on a PIP and whose PIP was discontinued.  *Id*. at ¶ 5.  Adams believes that this woman's PIP was not continued because she "is Chinese" and not Black.  *Id.*  In addition to her statements about others who were placed on PIPs, Adams also makes various statements opining that "David P. Augustine used the PIPs as a tool to eventually terminate employees" and that the PIPS were "just one of the tools he used for discriminatory practices." *Id. ¶* 10.  As to  Ms. Huddleston, Adams states that PIPs were "used in a discriminatory manner to punish her for complaining and speaking out."  *Id*. ¶ 11. The Court has sustained Defendants' evidentiary objections that these statements are conclusory, lack foundation, and are based on hearsay.  Even assuming these statements were admissible, however, they do not change the Court's conclusion.  Adams offers no specific statements that demonstrate that the circumstances under which she and the other woman were placed on PIPs (or taken off of them) were comparable to the circumstances relating to Ms. Huddleston's PIPs.  Nor does she offer any other specific facts to support her claims that Augustine used PIPs to discriminate against Ms. Huddleston or to punish her for speaking out.  No reasonable juror could conclude based on this evidence that it establishes discriminatory intent.

21

environment, a plaintiff "must raise a triable issue of fact as to whether (1) the defendants subjected her to verbal or physical conduct based on her [membership in a protected class]; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). "To determine if an environment is sufficiently hostile or abusive to violate Title VII, [courts] look at 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see also Sheridan v. Providence Health & Servs.-Oregon*, No. 10-CV-775-PK, 2011 WL 6887160, at *5 (D. Or. Dec. 29, 2011) ("To assert a hostile workplace claim under the ADEA, Plaintiff must meet the same requirements as for a hostile workplace claim under Title VII: the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class") (*citing Sischo–Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991), superseded by statute on other grounds as recognized by *Dominguez–Curry v. Nev. Trans. Dist.*, 424 F.3d 1027 (9th Cir. 2005)). A plaintiff must show that the work environment was both subjectively and objectively hostile. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).

### 2. Discussion

Ms. Huddleston has not met the first or third requirement of the *prima facie* case for harassment based on a hostile work environment.

As discussed above, other than the fact that Ms. Huddleston is the only African-American female and apparently the oldest employee in her department, there is no evidence in the record from which a jury could reasonably conclude that any of the conduct of which Ms. Huddleston complains was based on her membership in a protected class. Ms. Huddleston's own testimony that Defendants' conduct was based on her race, age, and sex is entirely speculative. Therefore, Ms. Huddleston has not demonstrated a triable issue of fact that she was subjected to verbal or

physical conduct based on her race, sex or age.

Further, none of the conduct at issue was so "severe and pervasive" as to create an abusive working environment under the standards articulated above. In particular, considering all the circumstances, the Court concludes that while Ms. Huddleston found the work environment to be hostile, she has not demonstrated a material issue of fact as to whether the work environment was *objectively* hostile. Although she believes she was subjected to a higher level of scrutiny than her coworkers, the scrutiny took the form of various negative evaluations and plans to improve her performance. As Ms. Huddleston has not demonstrated a fact question as to the substantive conclusions Defendants reached about her performance, this conduct is not sufficient to demonstrate a hostile work environment. Nor do the various reprimands and instructions by Lew and Augustine (e.g., to stop ripping paper by the copy machine, to respond immediately to pop-up messages, to use colored pens in her work, and to adhere to the dress code) meet this requirement. Rather, the Court concludes based on all the circumstances that Ms. Huddleston has failed to offer evidence that her work environment was, by an objective standard, hostile for the purposes of the ADEA and Title VII.

Defendants are entitled to summary judgment on Ms. Huddleston's harassment claims.

IV.    **CONCLUSION**

For the reasons stated above, the Motion is GRANTED. The Clerk is instructed to enter judgment in favor of Defendants on all claims.

    **IT IS SO ORDERED.**

Dated:  December 7, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge